**CITIES SERVICE GAS COMPANY,
Petitioner,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.**

No. 78–2009.

United States Court of Appeals,
Tenth Circuit.

Argued May 7, 1980.

Decided July 7, 1980.

Rehearing Denied Oct. 6, 1980.

Gregory Grady, Washington, D. C. (Dale A. Wright and James R. Schroll, Washington , D. C., with him on brief) of Littman, Richter, Wright & Talisman, P. C., Washington, D. C. (Alfred O. Holl, Oklahoma City, Okl., R. James Leithead, Tulsa, Okl., Wm. J. Sears and Ron W. Fry, Cities Service Gas Co., Oklahoma City, Okl., with them on brief), for petitioner.

Barbara J. Weller, Atty., Washington, D. C. (Robert R. Nordhaus, Gen. Counsel, and Jerome Nelson, Sol., Federal Energy Regulatory Commission, Washington, D. C., with her on brief), for respondent.

Before BARRETT, SEYMOUR and PECK,* Circuit Judges.

BARRETT, Circuit Judge.

Cities Service Gas Company (Cities) petitions this Court to review and set aside the Federal Energy Regulatory Commission's (Commission) Opinions Nos. 24 and 24–A issued August 29, 1978 and October 31, 1978 respectively.

Cities is a natural gas pipeline company which purchases natural gas from producers, and sells it to various customers in a number of midwestern states. Cities' sales for resale of natural gas in interstate commerce come within the Commission's rate jurisdiction.

The cost of purchased gas constitutes the largest single component of a pipeline company's cost of service and it is an expense of doing business which is recovered by the pipeline in the rates it charges to customers. Commission regulations allow pipelines to include provisions within their tariffs for purchased gas cost adjustments (PGA clauses) whereby a pipeline's changes in purchased gas costs are monitored and adjusted every six months without the need for rate

* The Honorable John W. Peck, Senior Judge of the Sixth Circuit Court of Appeals, sitting by designation.

proceedings every time producer prices increase. PGA adjustments reflect, on a six month basis, the current cost of purchased gas. Increases in purchased gas costs which occur between PGA filing adjustments are recorded in an unrecovered purchased gas account and are recovered through a surcharge filed with the next PGA adjustment.

During periods of increasing producer prices, pipelines, of necessity, incur substantial increases in their unrecovered purchased gas account balances. Furthermore, during the time period in question herein, the Commission's PGA regulations did not permit the collection of carrying charges on balances for unrecovered purchased gas costs. This policy was changed, however, on January 1, 1979, at which time the Commission adopted regulations effective prospectively allowing pipeline companies to collect carrying charges accrued on balances for unrecovered purchased gas costs. This policy change was undertaken after the Commission "found that pipelines were incurring greater balances in their deferred accounts for purchased gas costs. 18 C.F.R. 154.38(d)(4)(c)". [Commission's Brief at p. 4].

It is important to recognize that *PGA adjustments* reflect changes *only* in purchased gas costs and act to supplement, rather than to supplant, *general rate increase filings* in which a pipeline is allowed to adjust its rates to reflect changes in all of its costs.

The instant proceedings were initiated by Cities on July 23, 1973 when it filed a general rate increase. By order of August 22, 1973, the Commission suspended the rate filing for five months and permitted it to become effective, subject to refund on January 23, 1974. These rates, at issue here, were thereafter in effect from that date until April 22, 1975, when they were suspended by another rate proceeding.

By stipulation and agreement Cities and Commission resolved the majority of the issues relative to Cities' rate levels for the period affected. Agreement was not reached, however, on the propriety of including unrecovered purchased gas costs as working capital in Cities' rate base.

It is uncontested that during the January 23, 1974 to April 22, 1975 period, the cost of purchased gas to Cities rose dramatically due to producer price increases allowed by the Commission. These increases, in turn, substantially increased Cities' unrecovered purchased gas account during this period to an average annual balance of $10,915,-352.00, reflecting carrying costs of approximately $2 million annually.

On February 7, 1977, an administrative law judge (ALJ) denied Cities' proposal to earn a return on its unrecovered purchased gas costs by including that amount as working capital in its rate base. In so doing the ALJ observed:

. . . a comparison of Exhibit 2 (on which Cities Service's rates were based) with Exhibit 37 (on which the approved settlement was based) reveals that—with unrecovered purchased gas costs excluded from each exhibit—the total of the several elements conceded to comprise working capital dropped from $27.7 million (12 months ended March 31, 1973, as adjusted) to $19.2 million (12 months ended January 31, 1975)—a drop of $8.5 million. Accordingly, even assuming, *arguendo,* the validity of Cities Service's general philosophy as to the working-capital-nature of the expenditures involved, it is highly possible—if not totally probably [sic]—that the decreases with respect to the uncontested elements in working capital provided Cities Service with the funds for the so-called unrecovered purchased gas costs. [R.Jt. App. at p. 67].

The Commission affirmed the ALJ's refusal to permit Cities to earn a return on its unrecovered purchased gas costs but based its denial on different reasons. The Commission held, *inter alia* : Carrying charges on unrecovered purchased gas balances were prohibited by its regulations; whereas it had previously waived the regulations on two occasions and permitted carrying charges, both cases presented "unusual circumstances"; Cities failed to establish the average balance in its unrecovered purchased gas account was a representative

figure; and Cities failed to justify its proposed return on unrecovered purchased gas costs through its rates.

On appeal Cities contends: (1) the Commission unlawfully prohibited it from earning a return on an investment [unrecovered purchased gas costs] prudently and necessarily incurred in serving its customers; and (2) the Commission's purported "reasons" for denying cost recovery are illogical, arbitrary, capricious, and otherwise unlawful. Because of their direct interrelationship, these issues will be considered simultaneously.

■ Under 15 U.S.C.A. § 717c Cities has the burden of establishing that a proposed rate increase is "just and reasonable". Once a pipeline company has met this burden, the Commission is then obligated to determine and fix "just and reasonable" rates:

> The history of the Commission's early experience with the Natural Gas Act, 15 U.S.C. § 717 *et seq.*, has been fully developed in our first area rate opinion, *Permian Basin, supra* [390 U.S. 747] at 755–759 [88 S.Ct. 1344, 1353–1356, 20 L.Ed.2d 1312] and may be merely summarized here. With the passage of the Act in . 1938, 52 Stat. 821, Congress gave the Commission authority to determine and fix "just and reasonable rate[s]," § 5(a), 15 U.S.C. § 717d(a), for the "sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use . . . ." § 1(b), 15 U.S.C. § 717(b). The Act was patterned after earlier regulatory statutes that applied to traditional public utilities and transportation companies, and that provided for setting rates equal to such companies' costs of service plus a reasonable rate of return. *Mobil Oil Corporation v. Federal Power Commission,* 417 U.S. 283 (1974) at p. 301, 94 S.Ct. 2328 at p. 2342, 41 L.Ed.2d 72 [Footnotes omitted].

*See also: Federal Power Commission v. United Gas Pipe Line Co.,* 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967).

■ Once the Commission has rendered a decision on a particular rate increase, a court's review, under *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 1312 (1968), is structured rather narrowly:

> It follows that the responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. *The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.* Judicial review of the Commission's orders will therefore function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders for the character and future development of the industry. We are, in addition, obliged at this juncture to give weight to the unusual difficulties of this first area proceeding; we must, however, emphasize that this weight must significantly lessen as the Commission's experience with area regulation lengthens. 390 U.S. at pp. 791–792, 88 S.Ct. at p. 1373. [Emphasis supplied].

Thereafter, when the application of these criteria do not establish that the order produced an arbitrary result, the Commission

must be sustained. *Mobil Oil Corp., supra,* 417 U.S. at p. 308, 94 S.Ct. at pp. 2345–2346. A court cannot substitute its judgment for that of the Commission. *Kansas-Nebraska Natural Gas Company, Inc. v. Federal Power Commission,* 534 F.2d 227 (10th Cir. 1976); *Pan American Petroleum Corporation v. Federal Power Commission,* 352 F.2d 241 (10th Cir. 1965).

Furthermore, even though the Commission is not obligated to automatically afford relief from rising costs, *Federal Energy Regulatory Commission v. Pennzoil Producing Co.,* 439 U.S. 508, 99 S.Ct. 765, 58 L.Ed.2d 773 (1979), nevertheless it must render decisions predicated on "present day conditions". *United Railways v. West,* 280 U.S. 234, 50 S.Ct. 123, 74 L.Ed. 390 (1930).[1] And although the broad responsibilities of the Commission demand a generous construction of its statutory authority, *Amoco Production Company v. Federal Power Commission,* 465 F.2d 1350 (10th Cir. 1972), Commission rate determinations are subject to judicial review, *Amoco Production Company v. Federal Power Commission,* 491 F.2d 916 (10th Cir. 1973) and the Commission is not empowered to deny specific rights in rate proceedings under the guise of its expertise. *Colorado Interstate Gas Company v. Federal Power Commission,* 370 F.2d 777 (10th Cir. 1967).

Applying these standards, we must hold that the Commission action in excluding Cities' actual average balance of unrecovered purchased gas costs for the locked-in period here involved from Cities' rate base was arbitrary.

At the outset we observe that Commission does not dispute that Cities, of necessity, prudently incurred and invested an average annual balance of $10,915,352 in unrecovered purchased gas costs in serving its customers. Commission acknowledges, as it must, that these actual costs and the related capital investment incurred and occasioned by Cities, were, for the most part, caused directly by Commission approved producer price increases.

Under such circumstances, Commission's argument that its traditional rate making principles do not permit Cities to earn a return on purchased gas costs and that such costs do not constitute an "investment" upon which Cities is entitled to a return, cannot pass judicial muster. Neither are we impressed with Commission's contention that Cities has not established a showing of "adverse economic consequences", when, as here, it is undisputed that Cities' carrying costs on the aforementioned balance approximated $2 million per year.

We cannot condone Commission action which, on the one hand, allows producer price increases to pipeline companies, and, on the other hand, denies the pipeline companies a return on the investments they necessarily incur in servicing their customers while simultaneously incurring the increased producer prices.

We deem it somewhat ironic that the Commission, after amending its PGA regulations on June 1, 1979, allowing the recovery of carrying costs, persists, at this juncture, in denying Cities its requested relief. The Commission must, as observed by the Court in *United Railways, supra,* predicate its decisions on "present day conditions" and be guided thereby—rather than by pursuing traditional ratemaking principles in derogation of "present day conditions."

But for the Commission's own repeated actions, approving producer price increases, pipeline companies serving customers would not have incurred substantial unrecovered purchased gas cost balances and the capital investments directly related thereto.

Commission Opinions Nos. 24 and 24–A issued August 29, 1978 and October 31, 1978, respectively, are set aside.

---

1. Although the Court's remarks in this case were directed to a state commission, we believe

they are equally appropriate herein.