**EL PASO ELECTRIC COMPANY,**
Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 80–1763.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Feb. 8, 1982.

Carl W. Ulrich, Chapman, Duff & Paul, Washington, D. C., for petitioner.

John A. Cameron, Jr., Atty. F.E.R.C., Washington, D. C., for respondent.

Miller, Balis & O'Neil, P.C., Robert A. O'Neil, Washington, D. C., for Rio Grande Elec. Co-op., intervenor.

Before CHARLES CLARK, GARZA and SAM D. JOHNSON, Circuit Judges.

GARZA, Circuit Judge:

We are called upon to review Opinion Nos. 85[1] and 85–A[2] of the Federal Energy Regulatory Commission[3] denying petitioner's request to include within its rate base expenditures on construction work in progress and establishing 13.75 percent as the rate of return to which petitioner is entitled on common equity. Having found no merit to the contentions raised by the petitioner, we *affirm the decision* of the Commission.

## I.

### A. Background

Because El Paso challenges the exercise by the Commission of its authority to regulate the recovery of certain carrying charges on capital used in the construction of utility plants, a review of the ratemaking principles involved in the Commission's determination is warranted.

Normally, a regulated utility is entitled to recover from its ratepayers certain costs related to the construction of utility plants. One of the costs which a utility recovers from its ratepayers is the debt interest and reasonable equity return on the capital investment used to finance construction. There are, however, two mutually exclusive ratemaking methodologies by which these carrying charges on construction capital may be recovered in rates.

One method capitalizes the carrying charges incurred during the construction period as an Allowance for Funds Used During Construction (AFUDC). Under this method the cost of the completed plant will include all carrying charges recorded during the construction period, as well as the direct costs of land, labor and construction materials. Actual rate payments from ratepayers to cover the carrying charges begin only when the completed plant goes into operation. Then, the entire cost of plant (including AFUDC) is added to the rate base, which earns a rate of return on investment and is depreciated over the life of that plant.

The second method for recovering carrying charges incurred during the construction period permits the utility to include the uncompleted plant within the rate base. Under this method construction work in

---

1. El Paso Electric Company, Docket Nos. ER 77–488 and ER 78–520, Opinion and Order Affirming Initial Decision In Part and Reversing In Part (May 19, 1980).

2. El Paso Electric Company, Docket Nos. ER 77–488 and ER 78–520, Opinion and Order Denying Applications for Rehearing (July 17, 1980).

3. The Federal Energy Regulatory Commission (FERC) assumed most of the duties of the Federal Power Commission on October 1, 1977. In this opinion, the term "Commission" refers to either FERC or its predecessor agency, whichever was active during the time period referenced.

progress (CWIP) is treated as though it were a plant in service. The utility recovers carrying charges currently from ratepayers, rather than adding them to the cost of construction. The carrying charges are determined by the allowable return (debt and equity) that is applied to utility investment in an operating plant. The return on CWIP is recorded as income on a current basis (just as AFUDC) and actual cash payments are made by the ratepayers currently (unlike AFUDC).

Each method assures the utility that it will recover from ratepayers the carrying charges associated with construction investment. The difference between the two concerns the timing of that recovery. Traditionally, the Commission has required a utility to recover its carrying charges under the AFUDC method. The underlying reason for this policy is that the CWIP method, unlike AFUDC, produces a mismatch between the benefits of the construction program, which inure to future ratepayers, and the costs of financing that program, which are borne by present customers.

In Order Nos. 555 and 555–A,[4] the Commission set forth three limited situations in which it would permit a utility to recover construction costs pursuant to the CWIP methodology. Two of these permit relief under criterion not presented by these facts: where CWIP is associated with construction of (1) pollution control facilities and (2) fuel conversion facilities. Order Nos. 555 and 555–A also permit CWIP relief as part of a very limited third exception: where a utility "clearly and convincingly" establishes that it is in "severe financial distress" which "cannot otherwise be alleviated without materially increasing the cost of electricity to customers." Under this narrowly defined exception, a utility is permitted to include within its present rate base certain costs of work in progress permitting it to obtain the necessary cash flow to avoid severe financial difficulty.

## B. Facts

Petitioner, El Paso Electric Company (El Paso) is a vertically-integrated electric utility company providing service in Texas and New Mexico, in and around the city of El Paso. Its sales of electricity are subject to rate regulation by three separate jurisdictions. The Public Utility Commission of Texas regulates sales to Texas retail customers who account for 78 percent of El Paso's total annual sales. The New Mexico Public Service Commission also regulates retail sales to customers within its jurisdiction accounting for approximately 18 percent of El Paso's annual sales. El Paso has two wholesale customers including intervenor Rio Grande Electric Cooperative which receive service subject to FERC regulation. This wholesale class accounts for the remaining 4 percent of El Paso's total annual sales.

El Paso is a joint participant in the Arizona Nuclear Power Project (Palo Verde) with an undivided 15.8 percent share. The three generating units of Palo Verde are scheduled to go into service in 1983, 1984, and 1986, at which time it will be the largest nuclear generating station in the world. On July 1, 1977, El Paso filed a proposed unilateral rate increase for service to Rio Grande and its other wholesale customer with the Commission. This increase was based on both the "adjusted operating results of a 1976 test year," and the inclusion within the rate base of CWIP expenditures related to the Palo Verde project. El Paso's rate request was founded upon its allegation that CWIP relief was justified pursuant to the "severe financial distress" exception of Order No. 555.

El Paso's 1977 application for CWIP relief was first heard by an administrative law judge, and 21 days of hearing were conducted. The Commission staff and Rio

---

**4.** Order No. 555, Amendments to Uniform Systems Of Accounts For Public Utilities and Licensees and For Natural Gas Companies (Classes A, B, C, and D) and to Regulations Under the Federal Power Act and The Natural Gas Act, to Provide For Inclusion of Construc- tion Work In Progress In Rate Base, 10 F.P.S. 5–1133 (1976), *rehearing denied,* Order No. 555–A, Docket No. RM 75–13, Order Denying Rehearing (January 6, 1977), *aff'd sub nom., Ogelthorpe Electric Membership Corp. v. FERC,* 574 F.2d 637 (D.C.Cir.1978).

Grande opposed the application. The ALJ issued an initial decision in August, 1979 denying CWIP relief. El Paso then requested expeditious Commission review of the decision, and on Máy 19, 1980, the Commission issued Opinion No. 85, affirming the ALJ's decision. This opinion also granted El Paso a 13.75 percent return on common equity, and denied its request to reopen the record. On July 17, 1980, the Commission issued Opinion No. 85–A, which denied rehearing. The instant petition for review followed.

On April 24, 1981, El Paso filed a second application to the Commission for increased rates and CWIP relief asserting new and material evidence in support of its claim of severe financial distress. The Commission accepted El Paso's application for increased rates by order of June 30, 1981[5] but deferred a hearing to consider its CWIP request until after the Commission had completed its anticipated rulemaking addressing the CWIP issue. On July 27, 1981, the Commission issued a notice of proposed rulemaking[6] substantially revising the Commission's method of authorizing CWIP relief currently governed by Order No. 555. This rulemaking proceeding has yet to be concluded and no final rule has been issued.

## II.

El Paso initially asserts that the Commission erred in denying El Paso the CWIP relief it requested in its 1977 rate application. The Commission argues, however, that this issue is mooted by El Paso's 1981 application for CWIP relief which has been granted a hearing by the Commission and the pendency of the Commission's rulemaking proceeding which will likely establish new procedures for allowing CWIP relief. Because we are not persuaded by the Commission's argument, we find that El Paso's claim for CWIP relief has not been mooted by subsequent events.

Threshold questions of mootness, standing, ripeness and political questions are admittedly all part of the concept of "justiciability" which the Supreme Court has recognized as "a concept of uncertain meaning and scope." *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947, 959 (1968). The mootness doctrine, as an element of justiciability, is comprised of two distinct components. The most recognizable component is jurisdictional, founded in the Article III constitutional requirement that federal courts decide only "cases" or "controversies." *See Franks v. Bowman Transportation Co.*, 424 U.S. 747, 755, 96 S.Ct. 1251, 1259, 47 L.Ed.2d 444, 456 (1976). The second component consists of "policy considerations" which may in an appropriate case effect a court's determination as to whether a particular case should be litigated in the federal court at a particular time. *See, International Society for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809 (5th Cir. 1979); *see also Franks v. Bowman Transportation Co., supra* 424 U.S. at 756 n.8, 96 S.Ct. at 1260 n.8; *Dow Chemical Company v. EPA*, 605 F.2d 673 (3d Cir. 1979); *Chamber of Commerce of United States of America v. United States Department of Energy*, 627 F.2d 289 (D.C.Cir. 1980).

The precise issue before us is whether El Paso's subsequent application for CWIP upon which the Commission has granted, but deferred, a hearing and the notice of proposed rulemaking restating the standards under which CWIP relief can be granted moot or extinguish the necessity for us to determine the propriety of the Commission's prior denial of CWIP relief pursuant to Order No. 555, the vitality of which is seriously jeopardized by the Commission's proposed rulemaking.

---

5. El Paso Electric Company, Docket No. ER 81–426–000, Order Accepting for Filing and Suspending Revised Rates in Part, Rejecting in Part, Granting Motions for Summary Disposition in Part, Granting Interventions, and Establishing Price Squeeze and Hearing Procedures (June 30, 1981).

6. Construction Work in Progress for Public Utilities, Notice of Proposed Rulemaking, Docket No. RM 81–38 (July 27, 1981).

█ It is apparent that at this point in time, the facts before us present a dispute which is sufficiently alive and concrete so as to create a genuine "controversy" which, pursuant to the Article III component of the mootness doctrine, warrants federal court adjudication. Our conclusion in this regard is premised upon the fact that the present rules governing the approval of CWIP relief are set forth in Order No. 555 and these rules control petitioner's claim for relief at this time. The Commission's proposed rulemaking does not presently effect this fact. Furthermore, it is unclear at this time when the Commission will promulgate a new rule authorizing CWIP relief or if such rule will obviate the necessity for our decision here today. A case is not rendered moot simply because there is a possibility, or even a probability, that the outcome of a separate administrative proceeding may provide the litigant with similar relief. *Sierra Club v. Train*, 557 F.2d 485 (5th Cir. 1977); *Consumer's Union v. Miller*, 84 F.R.D. 240 (D.D.C.1979); *see also Chadha v. INS*, 634 F.2d 408, 417–18 n.6 (9th Cir. 1980), *cert. filed*, Docket No. 80–1832, 50 U.S.L.W. 3080 (May 1, 1981), *jurisdiction postponed*, —— U.S. ——, 102 S.Ct. 87, 70 L.Ed.2d 80, 81 (1981).

With respect to the issue of mootness, then, we must only determine whether "policy considerations" are such as to make the CWIP issue non-justiciable, notwithstanding the fact that Article III constitutional prerequisites for federal court jurisdiction exist. The Commission quite accurately points out that any relief granted by this court could be prospective only; thus, even if we were to find that El Paso was entitled to CWIP relief under Order No. 555, a newly promulgated rule of the Commission could extinguish almost immediately any relief this court grants. Furthermore, some of the issues raised on brief by El Paso

concerning CWIP relief are presently being reconsidered by the Commission, and this court is reluctant to set forth a hard and fast rule with respect to these issues without first permitting the Commission to use its own expertise to promulgate a new rule which subsequently, in the proper order of administration, will be subject to judicial review.

█ On the other hand, this case has been in litigation for four years and this court should be reluctant to refrain from its duty of deciding cases properly before it when such restraint is based solely on policy or prudential considerations. Furthermore, there is no assurance at this time that the mechanism by which El Paso seeks CWIP relief will be functional in the near future. If indeed the Commission has improperly considered or evaluated El Paso's claim of severe financial difficulty, then this Court should again be reluctant to refrain from addressing the issues and thereby prolong El Paso's financial distress. As we have previously noted, "actual hardship to the litigants of denying them the relief sought" is one aspect of the "policy" component of justiciability to be considered by a court in its determination. *International Society for Krishna Consciousness of Atlanta v. Eaves, supra* at 821, *quoting Poe v. Ullman*, 367 U.S. 497, 508–09, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989, 999 (1961). Finally, we hesitate to refrain from review when such arguably sets a precedent permitting an agency to escape review of its orders solely by the instigation of new rulemaking proceedings which may or may not effect those orders. On the whole, we do not believe that the facts before us present a case which the mootness doctrine, under either its Article III or policy components, compels dismissal of this case.[7] *See Dow Chemical Company v. EPA, supra.*

7. One of the El Paso's contentions in support of its argument that the Commission erred in its denial of CWIP relief is that the Commission arbitrarily refused to reopen the record to permit the receipt of more current evidence regarding El Paso's financial condition. Were we to find El Paso's contention meritorious, we would be required to remand this case to the Commission to reconsider El Paso's current financial condition. As previously noted, however, El Paso has subsequently filed a new rate application and the Commission has approved a hearing to review El Paso's current status. Since there is no relief with respect to this claim which this court can grant to El Paso, we find the claim mooted by subsequent events.

### III.

We therefore turn to the first issue presented by El Paso for our consideration. El Paso contends that the Commission's denial of El Paso's application for the inclusion of CWIP in its rate base was erroneous and should be reversed. It alleges three reasons in support of its argument: (1) that the Commission in evaluating El Paso's application improperly considered the decision of the Texas PUC which granted El Paso CWIP relief; (2) that the Commission unreasonably applied the "clear and convincing" standard of proof to El Paso's application; and (3) that the Commission arbitrarily denied El Paso's request to reopen the record. Since we have previously disposed of El Paso's latter argument, we consider each of the remaining allegations separately.[8]

#### A. Consideration of Texas CWIP Relief

El Paso operates a fully integrated electric system, not one in which separate physical facilities and costs can be apportioned for each class of customers. In setting rates, El Paso must determine the proper share of costs which each jurisdiction, by itself, must bear. To do so and to avoid any cross-subsidization between classes of customers, utilities consider each jurisdiction as if it were itself a separate company. This basis for determining rates and charges is referred to by El Paso as the "stand-alone" principle or "total company" concept. The "stand-alone" method assures that the customers within a given jurisdiction pay only their share of the total costs found prudent and recoverable by that jurisdiction, while also giving the utility an opportunity to recover the proper portion of its total costs from each other jurisdiction.

■ The underlying basis for this approach dates back to the decision of the Supreme Court in *Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898). In that case, the court held that the rates for rail service within one state could not be justified by revenues received from other

interstate or intrastate service, since one class of customers should be neither burdened by the losses from other service nor benefitted from non-jurisdictional profits. The principle set forth by *Smyth v. Ames* and subsequent cases is that, with respect to ratemaking, each jurisdiction or class of customers should pay its own way. *See, e.g., FPC v. United Gas Pipeline Co.*, 386 U.S. 237, 243, 87 S.Ct. 1003, 1007, 18 L.Ed.2d 18, 24 (1967); *Simpson v. Shepard*, 230 U.S. 352, 434–36, 33 S.Ct. 729, 754–755, 57 L.Ed. 1511, 1556 (1913).

El Paso argues that the Commission violated the "stand-alone" principle when it considered the CWIP relief granted by the Texas PUC in determining whether El Paso was entitled to CWIP relief pursuant to the "severe financial distress" standard of the Commission set forth in Order No. 555. El Paso asserts that the Commission should have considered only the financial status of the company with respect to its jurisdictional sales. We disagree.

■ The "stand-alone" principle is formulated to protect one class of customers from paying the costs attributable to another class. Its purpose is to avoid cross-subsidization and its focus is upon *who* pays. CWIP relief, however, is a special exception to the ordinary ratemaking process. Upon a showing of "severe financial distress," the Commission permits a company to charge rates for construction cost prior to the period in which it could normally do so. The focus of CWIP relief is timing, that is, *when* a party pays. Under either the CWIP or AFUDC method of financing construction costs, each class of customers pays its own allocated portion of the costs; there is no chance that a non-jurisdictional customer would ever bear the costs of construction attributable to the jurisdictional class. The Commission's actions, therefore, do not in any way impede upon the policy underlying the "stand-alone" concept.

Furthermore, we do not find the Commission's interpretation of Order No. 555 un-

*Hodge v. Seiler*, 558 F.2d 284, 289 (5th Cir. 1977).

8. See note 7, *supra.*

reasonable. The Commission has traditionally considered CWIP relief to be exceptional.[9] The high standard of proof set forth by Order No. 555 in order for the applicant to obtain relief evidences further the fact that CWIP relief is not to be granted lightly. Thus, it would be inconsistent with this policy to require the Commission to close its eyes to other aspects of a utility's operations in determining if a company suffers "severe financial distress" warranting such extraordinary relief.[10]

B. The "Clear and Convincing" Standard

El Paso also asserts that the Commission and the ALJ applied the "clear and convincing" standard of proof in a manner requiring El Paso to establish "severe financial distress" with absolute certainty. Since a utility's proof necessarily requires it to project future financial conditions, El Paso argues that it is impossible to establish "conclusively" severe financial distress. Our review of the record reveals that this contention is totally without merit.

▆▆ Neither the Commission nor the ALJ ever required El Paso to "conclusively" establish severe financial distress. Indeed, the ALJ quite effectively articulated the burden borne by El Paso:

EPEC's claims for relief must be evaluated against the "clear and convincing" standard which the Commission has imposed. EPEC need not make out a case beyond a reasonable doubt, but it must do more than show that more likely than not it is in "severe financial difficulty which

cannot be otherwise alleviated without materially increasing the cost of electricity to consumers." An aggregation of doubts about the credibility of testimony or the accuracy of exhibits might invalidate a case under the "clear and convincing" standard where the same showing would withstand attack under the minimal "preponderance of evidence" civil standard.

Furthermore, our review of the ALJ's Initial Decision and the Commission's Orders reveals that each applied the above standard of proof which we have approved. In his thorough and detailed analysis, the ALJ addressed the evidence presented by El Paso and specified various deficiencies, improper assumptions and miscalculations which led him to question its credibility. The ALJ indicated that there was significant evidence including some presented by the petitioner establishing that El Paso was not in severe financial distress. It is overwhelmingly apparent for the reasons articulated by the ALJ that El Paso never met the burden set forth in Order No. 555 requiring it to show "clearly and convincingly" that it suffered severe financial distress.

## IV.

▆▆ El Paso's final contention in this appeal is that the Commission's grant of a 13.75 percent return on common equity in lieu of El Paso's request for a 15 percent return is not justified by substantial evi-

9. In Order No. 555-A, the Commission refused to reconsider the inclusion of all CWIP in the rate base stating:

In considering the proper treatment for CWIP for electric utilities, the Commission made the basic determination that only CWIP associated with pollution control and conversion devices should be included in the rate base in all cases. With respect to the remaining CWIP for electric utilities, the Commission determined in general that such CWIP should not receive rate base treatment. However, the Commission also noted that there might be special cases in rare instances where, because of extreme financial hardship, it would be in the public interest to permit an electric utility to receive rate base treatment for CWIP not related to pollution

control or conversion devices. Therefore, the Commission established rate base treatment for such CWIP. In view of the Commission's finding that such relief would be granted only in the most extraordinary of circumstances, it is appropriate that such relief be prospective only.

10. As the ALJ correctly noted, "FERC Order No. 555 does not invite us to pretend that the utility is worse off than it really is or to hypothesize a non-existent state of affairs. Rather it provides for an inquiry into the actual financial condition of the company," *El Paso Electric Co.*, Initial Decision Denying Construction Work in Progress and Establishing Rate of Return, Docket Nos. ER 77–488 and ER 78–520, at 21 (August 3, 1979).

dence in the record. Because we find this claim totally without merit, we dismiss it.

El Paso argues that the Commission's determination of the rate of return was based exclusively upon a defective comparable earnings study introduced into evidence by the Commission's staff. El Paso also contends that the Commission failed to consider all relevant factors, including current financial conditions, in evaluating the requested 15 percent return. The record supports neither of these contentions.

In Opinion No. 85, the Commission essentially adopted the findings of the ALJ modifying his decision only to the extent that it raised the rate of return on common equity to which El Paso was entitled from 13.0 to 13.75 percent. Our examination of El Paso's claims, therefore, requires us to look beyond Opinion 85 to the Initial Decision of the ALJ.

The ALJ's consideration of the proper rate of return, as evidenced by his decision, clearly took into account more factors than the Commission staff's comparable earnings test. Indeed, evidence presented by all three parties, El Paso, the Commission and Rio Grande, was analyzed, evaluated and considered. Furthermore, it is apparent that the ALJ took into account the various deficiencies he perceived in each of the parties' evidence. Ultimately, he concluded that "[b]ased on all the evidence that has been presented, I find that a just and reasonable rate of return on common equity is 13 percent." The opinion of the ALJ is an exhaustive and detailed analysis of the record evidence. The choice of the Commission to adopt it is entitled to deference.

In summary, we find the Commission's decision supported by substantial evidence, *Tenneco Oil Co. v. FERC*, 571 F.2d 834, 839–40 (5th Cir. 1980), and we find no error in the Commission's denial of CWIP relief.

AFFIRMED.