CITY OF CHARLOTTESVILLE,
VIRGINIA, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Columbia Gas Transmission Corporation,
et al., Interstate Natural Gas Association of America, Intervenors.

No. 80–1175.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 2, 1981.

Decided Aug. 7, 1981.

Petition for Review of an Order of the Federal Energy Regulatory Commission.

William T. Miller, Washington, D. C., with whom Stanley W. Balis, Washington, D. C., was on the brief, for petitioner.

Joshua Z. Rokach, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Robert R. Nordhaus, General Counsel and Jerome M. Feit, Deputy Sol., Washington, D. C., were on the brief, for respondent.

Giles D. H. Snyder, Charleston, W. Va., with whom John H. Pickering, Timothy N. Black and Andrea Timko Sallet, Washington, D. C., were on the brief, for intervenors, Columbia Gas Transmission Corp., et al.

Dale A. Wright, James T. McManus, Lawrence V. Robertson, Jr. and John H. Cheatham, III, Washington, D. C., were on the brief, for intervenor, Interstate Natural Gas Association of America.

Stephen A. Wakefield and Irving Jacob Golub, Houston, Tex., were on the brief, for amicus curiae, United Gas Pipe Line Co. urging affirmance.

Ronald D. Jones, New York City, was on the brief, for amicus curiae, Edison Electric Institute urging affirmance.

David J. Muchow, Arlington, Va., and John A. Myler, Washington, D. C., were on the brief, for amicus curiae American Gas Association urging affirmance.

Edward Berlin and Frances S. Blake, Washington, D. C., were on the brief, for amicus curiae New England Power Co. urging affirmance.

Before MacKINNON and WALD, Circuit Judges and AUBREY E. ROBINSON, Jr.,[*] District Judge.

[*] Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

Opinion for the Court filed by District Judge AUBREY E. ROBINSON, Jr.

Concurring opinion filed by Circuit Judge WALD.

Opinion dissenting in part filed by Circuit Judge MacKINNON.

AUBREY E. ROBINSON, Jr., District Judge:

## INTRODUCTION

Petitioner seeks review of Federal Energy Regulatory Commission orders issued in Opinion Nos. 47[1] and 47–A[2] which increased rates for two interstate pipeline companies, Columbia Gas Transportation Corporation and Columbia Gulf Transmission Company.[3] The City of Charlottesville, Virginia[4] challenges a commission change in policy on the tax component of the cost of service.[5] The Commission allowed the Columbia pipeline companies to include in their rates the tax costs they would incur if they separately filed federal income tax returns ("stand-alone" tax costs). In fact, these companies do not separately file but are members of a corporate group that files a consolidated tax return.[6] The tax costs allowed these companies by the Commission are greater than their proportionate shares of the consolidated tax liability.[7]

The Commission allowed the pipeline companies to include "stand-alone" tax costs in their rates so their parent company could retain the savings obtained from filing a consolidated tax return for use by the exploration and development affiliates[8] whose losses in part made possible the savings. In addition, the Commission found that the rate orders accounted for the

---

**1.** *Opinion Determining Proper Cost of Service Treatment of Tax Liability Arising From the Filing of Consolidated Income Tax Return,* (July 2, 1977), Joint Appendix (J.A.) 262–280 [hereinafter Opinion No. 47].

**2.** *Opinion and Order Denying Rehearing,* (December 20, 1979), J.A. 338–347 [hereinafter Opinion No. 47–A].

**3.** The two pipeline companies are affiliated with thirteen other companies in addition to the parent company, Columbia Gas System, Inc. Three of these companies are engaged in exploration for and development of natural gas supplies (Columbia Gas Development Corp., Columbia Gas Development of Canada, Ltd., and Columbia Coal Gasification Corp.); seven are distributors selling gas to consumers in Kentucky, Maryland, New York, Ohio, Pennsylvania, Virginia and West Virginia; one is in the Hydrocarbon business; one is in the liquified natural gas business; and one is a so-called "service" company.

**4.** The City of Charlottesville has standing in this action pursuant to 15 U.S.C. § 717c(e) (Supp. III 1979), which provides in pertinent part:

Whenever any such new schedule is filed the Commission shall have authority either upon complaint of any State, *municipality,* State commission, or gas distributing company, or upon its own initiative without complaint, at once ... to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service ...
(emphasis added).

**5.** In ratemaking, determining the cost of service, including taxes, is among these four basic determinations the Commission must make:

(1) what are the enterprise's gross utility revenues under the rate structure examined; (2) what are its *operating expenses,* including maintenance, depreciation and all taxes, appropriately incurred to produce those gross revenues; (3) what utility property provides the service for which rates are charged and thus represents the base (*rate base*) on which a return should be earned and (4) what percentage figure (*rate of return*) should be applied to the rate base in order to establish the *return* (wages of capital) to which investors in the utility enterprises are reasonably entitled.

A. J. G. Priest, *Principles of Public Utility Regulation* 45 (1969) (emphasis in original). The inclusion of federal income taxes as operating expenses is well established. *See, e. g., Galveston Elec. Co. v. City of Galveston,* 258 U.S. 388, 399, 42 S.Ct. 351, 356, 66 L.Ed. 678 (1922).

**6.** Affiliated companies have the option of filing their federal income tax returns on a consolidated basis. 26 U.S.C. §§ 1501 *et seq.* (1976). The Columbia group has elected to file a consolidated return since 1947. J.A. 248. Principal among the benefits that accrue to companies that file a consolidated return is that losses of any affiliate can be set off against the taxable income of other affiliates in the group. C. Phillips, *The Economics of Regulation* 214 (1969).

**7.** *See* text accompanying notes 14 and 15 *infra.*

**8.** J.A. 274–278.

method by which the affiliates acquired capital from their parent.[9] Finally, the Commission found that a one-time loss reducing the consolidated tax liability should not be used in computing a prospective rate order.[10] Petitioners challenge the authority and factual support for the orders that issued.

We find that the Commission failed to adequately specify the evidence on which the rate orders were premised. Therefore, we remand the case to the Commission for further consideration.

## I. PROCEEDING BELOW

In 1975, Columbia Gulf and Columbia Gas filed for rate increases of $3.7 million and $87.9 million respectively. The Commission suspended the proposed rate increases and allowed a number of parties, including the Petitioner, to intervene. Settlement was reached on all issues except those of consolidated tax treatment and two other issues not relevant here. Hearings were conducted before an Administrative Law Judge, who ruled against the pipeline companies.[11] Columbia argued that the pipelines should benefit from consolidated return savings. The Judge found that the consolidated tax liability for the Columbia system was lower than the aggregate of the tax liabilities if every company within the system had filed a separate return.[12]

Tax losses used to lower consolidated tax liability were generated by three sources: (1) the parent company (which was always in a loss posture because it "lent" capital to affiliates at a loss yet did not have to report dividends paid to it by affiliates); [13] (2) by exploration and development companies (Columbia Gas Development Corp., Columbia Gas Development of Canada, Ltd., and Columbia Coal Gasification Corp.); and (3) by Columbia of West Virginia (whose losses Columbia argued were of a non-recurring nature and should be disregarded).

The ALJ found that for the test period, the pipeline companies' Federal income tax liability was $98.5 million (through consolidated returns).[14] Had the pipeline companies filed independent returns, their liability for the three-year test period would have been $159.4 million.[15] The principal basis for the ALJ's ruling disallowing the rate increase was his finding that a large portion of the consolidated tax savings retained by the parent company were not used for exploration and development (e & d), as contended by the pipeline companies but rather went for general corporate purposes.[16]

This matter came before the Commission, which on June 29, 1978 reversed the initial decision of the Administrative Law Judge in its entirety.[17] The City lodged a petition for rehearing which was denied on December 20, 1979 in Opinion 47-A.[18] The City then filed its appeal in this Court.

## II. STANDARD OF REVIEW

### A. Historical Perspective

The issue of whether jurisdictional ratepayers or corporate shareholders should benefit from reduced consolidated tax liability resulting from non-jurisdictional loss-

---

9. J.A. 277.

10. J.A. 278.

11. Initial Decision, Dockets RP 73–86, *et al.* and RP 735–106, *et al.*, July 7, 1977, J.A. 242.

12. J.A. 248. Until 1973, the Columbia pipeline companies reflected consolidated tax savings in their cost of service, but in 1973, with the advent of a Commission change in policy, *see* text accompanying note 25 *infra*, the pipeline companies no longer reflected these savings.

13. *See* 26 C.F.R. §§ 1.1502–14(a) (dividend payments from one affiliate to another are not taxable).

14. J.A. 251.

15. *Id.*

16. J.A. 251–52. The Judge also rejected the pipelines' argument that some losses during the test years were nonrecurring and should not be considered in setting future rates.

17. *See* note 1 *supra*. The Commission's rationale is discussed in Part III, *infra*.

18. *See* note 2 *supra*.

es has been a subject of controversy in ratemaking for almost two decades.[19] The first major consideration of this issue came in 1964 when the Tenth Circuit reversed the Federal Power Commission and ordered it to allow the corporation and not the ratepayers the benefit of a reduction in tax liability effected by consolidated returns. *Cities Service Gas Co. v. FPC*, 337 F.2d 97, 101 (10th Cir. 1964).[20] The Court found that connecting the losses of non-jurisdictional businesses to the jurisdictional rates was a violation of a Congressional requirement that profits and losses of regulated and non-regulated companies be kept separate. *Id.* The Fifth Circuit followed the lead of *Cities Service* in *United Gas Pipeline Co. v. FPC*, 357 F.2d 230 (5th Cir. 1966),[21] by holding that the federal income tax allowance in a rate should have been computed on a separate return basis.[22]

The Supreme Court reversed the Fifth and Tenth Circuits in *FPC v. United Gas Pipeline Co.*, 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967). The Court declared that the Commission has the power to take into account consolidated tax savings—generated from whatever source—when determining a company's cost of service tax allowance.[23] At the same time, however, the Court declared that there is no specific treatment mandated for the allocation of consolidated tax savings.[24]

United Gas Pipe Line Co. was a subsidiary of the United Gas Corporation. The parent corporation filed consolidated tax returns for the years 1957 to 1961. The losses of United's two oil and gas production exploration affiliates over this five year period reduced the group's consolidated tax liability. United Gas Pipeline claimed that its allowance for federal taxes in its rate should have been computed on a stand-alone basis at the full statutory rate (then 52 percent). The FPC denied the claimed allowance and spread the consolidated taxes among the affiliated companies in the United Group. United Pipe Line was allocated $9.9 million, which was $2.1 million less than its stand-alone claim.

In upholding the Commission, the Supreme Court stated:

There is no frustration of the tax laws inherent in the Commission's action. The affiliated group may continue to file consolidated returns and through this mechanism set off system losses against system income. The tax law permits this, but it does not seek to control the amount of income which any affiliate may have. Nor does it attempt to set United's rates. This is the function of the Commission, a function performed here by rejecting that part of the claimed tax expense which was no expense at all, by reducing cost of service and therefore rate, and allowing United only a fair return on its investment.

386 U.S. at 246–47, 87 S.Ct. at 1009.

Despite endorsement by the Supreme Court of its tax cost treatment, the Federal Power Commission changed its policy in

**19.** With one exception, the Commission always required the benefits of consolidated tax filings to go to ratepayers when the group filing the consolidated return consisted of regulated affiliates, i. e. there were no non-jurisdictional losses reducing tax liability. *Home Gas Co.*, 13 F.P.C. 241 (1954); *United Fuel Gas Co.*, 12 F.P.C. 251 (1953) ("We have consistently held that consumers would be charged for only the actual liability for Federal income taxes . . . If, by filing a consolidated return a reduction of this cost is effected, such reduction should be reflected in the cost charged to consumers); *Hope Natural Gas Co.*, 12 F.P.C. 342, 347 (1953). *See also Michigan Wisconsin Pipeline Co.*, 13 F.P.C. 326, 373 (1954); *Atlantic Seaboard Corporation*, 11 F.P.C. 486, 515 (1952); *Hope Natural Gas Co.*, 10 F.P.C. 583, 612 (1950); *Penn-York Natural Gas Corp.*, 5 F.P.C. 33, 38–39 (1946). *Cf. Olin Gas Transmission Corp.*, 17 F.P.C. 695 (1956) (FPC ignored consolidated tax savings and applied statutory rate to determine the tax allowance for the regulated company).

**20.** *Rev'g* Cities Service Gas Co., 30 F.P.C. 158 (1963).

**21.** *Rev'g United Gas Pipeline Co.*, 31 F.P.C. 1180 (1964).

**22.** 357 F.2d at 231.

**23.** 386 U.S. at 245–46, 87 S.Ct. at 1008–1009.

**24.** *Id.*

1972. In *Florida Gas Transmission Co.*,[25] the Commission departed from its policy which required that ratepayers receive the benefits of consolidated tax savings. It declared that a "utility should be considered as nearly as possible on its own merits and not on those of affiliates." [26] The Commission allowed the gas pipeline company in that case to include as its tax cost the amount it would pay on a stand-alone basis despite the fact that the company was part of a group filing a consolidated tax return.[27] The *Florida Gas* decision was not appealed and the Commission policy has never been subjected to judicial scrutiny.[28]

The policy decision in this case must be examined on its own merits. The issues here on appeal, while analogous to those in the *Florida Gas* decision, are shaped by justifications not offered by the Commission in that earlier case. In *Florida Gas*, the losses reducing the consolidated tax liability were generated by a regulated affiliate, the parent distribution company, which was not engaged in exploration and development. Additionally, the Commission emphasized the complexity of business affiliations as the principal reason for its decision and made only passing reference to incentives for development as a basis for the

change in policy.[29] While the effect of the *Florida Gas* decision may be the same as the effect of the Commission's decision in this case, the underlying rationales are distinct. Thus, the regulatory decision reached by the Commission in this case must be examined afresh.

## B. Review Criteria

The Natural Gas Act fails to prescribe specific standards for ratemakers to follow. In fact, the only requirement is that a rate be "just and reasonable".[30] This paucity of statutory guidance has resulted in judicial deference to administrative ratesetting.[31] However deferential the judiciary may be, courts have never given regulators carte blanche. While the Act itself may be lacking in standards for the Commission to follow, the judiciary has inferred certain requirements from the "just and reasonable" standard.

Judicial review evolved from the end result test enunciated by Justice Douglas in *Federal Power Comm. v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944):

> Under the standard of "just and reasonable", it is the result reached and not

25. 47 F.P.C. 341 (1972).

26. *Id.* at 363.

27. *See also* Natural Gas Pipeline, 50 F.P.C. 789 (1973).

28. This Court has not had to address the issue. In reviewing nationwide natural gas rate orders, Judge Leventhal observed:
"[T]he implausability of net non-jurisdictional loss for the producers—at least in the absence of contrary evidence from the petitioners—renders unnecessary any inquiry into savings from consolidated returns."
*American Public Gas Ass'n v. FPC*, 567 F.2d 1016 (D.C. Cir. 1977).

29. 47 F.P.C. at 362.

30. Legislative guidance on natural gas ratemaking consists of the following:
*All rates and charges* made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations

affecting or pertaining to such rates or charges, *shall be just and reasonable*, and such rate or charge that is not just and reasonable is hereby declared to be unlawful. 15 U.S.C. § 717c(a) (Supp. III 1979) (emphasis added). *See also Id.* § 717c(e) (Commission has power to determine lawfulness of rates). Congress has rejected several legislative amendments that would prohibit federal regulatory agencies from using consolidated tax savings to reduce the regulated companies' tax allowance in its cost of service. *See, e. g.*, Amendment No. 337 to Revenue Act of 1964, 78 Stat. 19. It is reading too much into this legislative history to suggest that Congress implicitly requires flow-through of consolidated tax savings to ratepayers.

31. *See, e. g., FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *American Public Gas Ass'n v. FPC*, 567 F.2d 1016 (D.C. Cir.1977).

the method employed which is controlling. (citation omitted).... If the total effect of the rate order cannot be said to be unjust and reasonable, judicial inquiry is at an end.

320 U.S. at 602, 64 S.Ct. at 287. Experience has taught that a determination of whether the result reached is just and reasonable requires an examination of the method employed in reaching that result. *Permian Basin Area Cases*, 390 U.S. 747, 791–92, 88 S.Ct. 1344, 1372–1373, 88 L.Ed. 333 (1968).[32] In examining Commission methodology, "[w]hat is basic is the requirement that there be support in the public record for what was done." *American Public Gas Ass'n v. Federal Power Comm'n*, 567 F.2d 1016, 1029 (D.C.Cir.1977).

In reviewing the record, this Court engages in an inquiry akin to the "substantial evidence" inquiry mandated by the Administrative Procedure Act, 5 U.S.C. § 706(2)(E) (1976). *City of Chicago v. Federal Power Comm'n*, 458 F.2d 731, 743 (D.C.Cir.1971).[33] Indeed, this Court has required the Commission to specify the evidence on which it relied and to explain how that evidence supports the conclusion it reached. *Colum-*

*bia Gas Transmission Corp. v. FERC*, 628 F.2d 578, 589 n.51 (D.C.Cir.1979). "In every case, the object of review is to determine whether a reasoned conclusion from the record as a whole could support the premise on which the Commission's action rests. *City of Chicago*, 458 F.2d at 744.[34]

These propositions on the standard of review apply to this case. An even more particular standard applies when the Commission seeks, as here, to encourage exploration and development through increased rates to consumers. This Court in *City of Detroit v. FPC*, 230 F.2d 810 (D.C.Cir.1955) stated that:

[i]f the Commission contemplates increasing rates for the purpose of encouraging exploration and development ... it must see to it that the increase is in fact needed and is no more than is needed for the purpose. Further than this we think the Commission cannot go without additional authority from Congress.

*Id.* at 817.

Our task is to determine whether there is factual support in the record for the rate order that issued and the resulting change

---

**32.** In *Permian Basin*, the Supreme Court explained the expanded role of the judiciary in reviewing rate orders:

It follows that the responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the *methods of regulation* which it has itself selected, and *must decide whether each of the order's essential elements is supported by substantial evidence.* Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the commission has given reasoned consideration to each of the pertinent factors. *Judicial review of the Commission's orders will therefore function accurately and effica-*

*ciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act,* as well as its assessment of the consequences of its order for the character and future development of the industry.
390 U.S. at 791–92, 88 S.Ct. at 1373 (emphasis added).

**33.** The Natural Gas Act does not expressly require a hearing on the record for ratemaking, *American Public Gas Ass'n*, 567 F.2d at 1029, and thus the "substantial evidence" review provision of the Administrative Procedure Act does not by its terms apply. However, Section 19(b) of the Natural Gas Act provides that the "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive," and thus our inquiry is like that mandated by 5 U.S.C. § 706(2)(E).

**34.** Of course, the premise on which the Commission's action rests must be one with which the Natural Gas permits the Commission to be concerned and the Commission's actions on that premise must be within its statutory authority. *City of Chicago*, 458 F.2d at 745. *See* text accompanying notes 38 and 39 *infra*.

in policy.[35] As to that part of the rate order premised on the encouragement of exploration and development, we must determine whether there is evidentiary support for the proposition that a stand-alone tax cost in the rate base, with a resulting increase in rates, will directly result in such development.

## III. THE COMMISSION RECORD

The Commission fails to meet the substantial evidence test on two of the three major justifications offered in support of Orders 47 and 47–A. First, apparently recognizing that ratepayers should receive the consolidated tax benefits resulting from the Columbia parent's peculiar method of distributing capital to affiliates, the Commission maintains that its rate order will insure the ratepayers the benefits; however, the record is sketchy. Second, the one-time losses of the Columbia West Virginia affiliate which reduced tax liability for the test period should not be reflected in a prospective rate order according to FERC; the Commissions findings in this regard were based on substantial evidence. Finally, the Commission urges that the rate order will encourage exploration for the development of natural gas resources; here, the Commission is on weakest ground.

### A. Columbia's Capital Distribution

Almost half of the consolidated tax benefits stem from the relationship between the parent company and the subsidiaries, whereby the parent borrows money at high rates and lends it at low rates, resulting in a balance sheet loss. This loss reduces Columbia's consolidated tax liability. There is no principled basis for giving Columbia, and

denying the ratepayers, the benefit of this tax savings. No policy of the Natural Gas Act would be furthered by allowing Columbia to keep the benefits of this bookkeeping device. FERC does not contest this point.

The Commission claims that the stand-alone tax liability reflects a reduction in the subsidiaries' taxable income resulting from the deduction of the parent's cost of capital, the "real" cost, as an expense. Alternatively, the "book" cost (calculated at the lower rate at which the parent "lent" to the affiliate) could have been used as a deduction, which would have resulted in a larger stand-alone tax liability than that reflected in the rate order. FERC explains that the calculation of stand-alone tax liability passes through the benefits of the parent's capital distribution losses to the ratepayers. The Commission concluded that the reduction in stand-alone taxable income results in an income tax exactly equal to that calculated by using a higher taxable income (arrived at by deducting the affiliates' "book" interest expense) and then subtracting the tax benefit of the losses attributable to the affiliates' use of the parent's capital.

The City of Charlottesville challenges the Commission's conclusion that ratepayers receive the tax benefit of this capital distribution plan. Petitioner alleges that the rate base of each affiliate is calculated using the parent's capital costs. Accordingly, with an increased rate base, there is an increase in income which must be recouped from ratepayers, which diminishes the prior adjustment to taxable income. Under this analysis, the tax benefit is passed-through to ratepayers in the tax cost component of the affiliates' rates but is concurrently recouped by the Company through higher af-

---

**35.** The fact that a change in policy has occurred is no basis, by itself, for viewing the Commission's decision with disfavor. This Court has never stood in the way of a policy change when supported by reasoned analysis. *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970). Judge Leventhal explained:

> Judicial vigilence to enforce the Rule of Law in the administrative process is particularly called upon where, as here, the area under consideration is one wherein the Commis-

sion's policies are in flux. An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.

filiate rates premised on a rate base reflecting the parent's higher cost of capital.

An evaluation of Petitioner's claim requires an examination of the interaction between the tax calculation and other portions of the ratemaking formula not briefed to the Court. The record before the Court is incomplete on the relationship between the tax costs and capital costs included in the rate base. On remand, the Commission should consider whether the capital distribution tax benefits are in fact passed-through to ratepayers or whether the pass-through is vitiated by rates premised on a rate base which is inflated by the parent's cost of capital.

### B. The West Virginia Losses

The losses incurred by Columbia of West Virginia during the test period on which the rates at issue were based were the result of a temporary rate moratorium imposed by state regulators. The Commission found, based upon substantial evidence, that the losses would be non-recurring and that the West Virginia affiliate would not generate tax benefits during the term of the prospective rate order. The Commission adjusted the base-period expenses by ignoring the losses and their associated tax benefits before estimating future tax liabilities.

This aspect of the contested rate order is affirmed. The Commission's treatment of losses of the West Virginia affiliate was a wholly sensible solution to a problem that frequently arises in ratemaking. Ratemakers must project future expenses from past expenses.[36] When there is evidence that past expenses are inaccurate predictors, the Commission may ignore them.[37] The Commission is affirmed on its treatment of the one-time losses incurred by Columbia of West Virginia.

### C. Encouraging Exploration and Development

The Commission is not obligated to follow any particular formula for the apportionment of consolidated tax savings.[38] The *United* ruling allowed flow-through to ratepayers but did not mandate it. *FPC v. United Gas Pipe Line Co.*, 386 U.S. at 246, 87 S.Ct. at 1008. The Commission had authority to allow Columbia the benefits of consolidated tax savings as an incentive to exploration and development [39] by adjusting the tax cost component of affiliates' rates. Adjustment of rates to encourage exploration for and development of natural gas is a proper Commission activity. *Permian Basin Area Rate Case*, 390 U.S. 747, 798, 88

---

**36.** *See Mississippi River Fuel Corp. v. Federal Power Comm'n*, 163 F.2d 433, 437 (D.C.Cir. 1947).

**37.** *Id.*

**38.** Petitioner suggests that the Commission is constrained by some immutable "actual taxes paid" principle. The City no doubt finds solace in the words of the late Judge Prettyman, who declared:

> Expenses (using that term in its broad sense to include not only operating expenses but depreciation and taxes) are facts. They are to be ascertained, not created, by the regulatory authorities. If properly incurred, they must be allowed as part of the composition of the rates. Otherwise, the so-called allowance of a return upon investment, being an amount over and above expenses, would be a farce.

*Mississippi River Fuel Corp. v. F. P. C.*, 163 F.2d 433, 437. While ascertaining "actual" expenses is a desirable goal in ratemaking, the complexities of accounting, business organization and tax laws often preclude finding any

one "actual" cost. *American Public Gas Ass'n v. FPC*, 567 F.2d 1016, 1038 (D.C.Cir.1977). This is especially true with tax costs. For example, with depreciation, utilities often claim higher depreciation deductions in filing tax returns than they do in estimating the tax component of their cost of service. This results in a higher tax for ratemaking purposes than is actually paid and this deviation from the "actual taxes paid" principle has been upheld. *See, e. g., FPC v. Memphis Light, Gas & Water Division*, 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973); *Memphis Light, Gas & Water Division v. FPC*, 500 F.2d 798 (D.C.Cir.1974).

**39.** The more traditional regulatory device to create incentives for investment is adjustment of the rate of return allowed a regulated utility. A higher rate of return will allow the regulated utility to attract capital for exploration and development. *See* C. Phillips, *The Economics of Regulation*, 292 (1969). In Columbia's case, a higher rate of return for the gas producers would have been the more direct incentive.

S.Ct. 1344, 1376, 20 L.Ed.2d 312 (1968); *City of Detroit*, 230 F.2d at 817. While the Commission has legal authority to do what it did in this case,[40] it lacked factual support for Orders 47 and 47–A.

In Opinion No. 47, the Commission declared:

> To require Columbia to pay its pipeline customers the tax savings from losses incurred in the search for new gas supplies will operate as a disincentive to continued gas supply development activities by pipelines and other regulated utilities.[41]

Thus, as justification for allowing the parent corporation to keep tax savings created by e & d companies by attributing standalone tax costs to the affiliates, the Commission suggests that retention will result in greater e & d.[42] While the Commission did not fully explain its incentive theory, it appears that the incentive to invest may take effect in two ways: (1) a company may initially invest in e & d with the knowledge that some of the investment will be returned through a tax benefit for general use; or (2) a company may reinvest money returned by e & d losses. Under the first form of incentive, it would not matter to what use the returned investment is put since a company would spend more in the first place knowing that some of the money would be returned. Under the alternative formulation, the money returned via a tax benefit would have to be reinvested for the incentive to work.

The Commission's reliance on the incentive effect of retained tax benefits is not supported by evidence in the record.[43] There is no indication that Columbia's e & d investments were any greater after FERC's change in tax cost policy[44] than before the supposed incentive was created. And it appears that there was only a partial incentive to reinvest. The FERC ALJ found that only a portion of the tax savings were routed to e & d companies, with the remainder being used for general corporate purposes.[45]

---

**40.** The Commission validly exercised its legal authority. The City maintains that the resignation of one of the majority Commissioners before the issuance of the Opinion renders the opinion a .nullity. We find no merit in this argument. All four Commissioners in office at the time of the rehearing unanimously confirmed in Opinion 47–A that Opinion 47 was the decision of the Commission.

**41.** J.A. 276. The Commission's reference to "gas supply development activities by pipelines and other regulated utilities" is interpreted to mean development activities by the unregulated e & d affiliates in the Columbia group. There is no evidence of record that the pipeline companies themselves undertook development activities and the e & d companies are not "other regulated utilities".

**42.** The Commission also maintains that retention of tax benefits by the parent company would ensure parity between Columbia's gas production activities and those of other producers independent of jurisdictional pipelines. J.A. 276–77, 342. The Commission's function in a pipeline rate case is to set a rate that is fair to the pipeline company and to its ratepayers; its concern with parity between pipeline-affiliated producers and independent producers, if valid at all, should be only one of many factors that may be considered in determining this rate. After all, pipeline-affiliated producers begin with an advantage independent producers lack—they know that profits will exist to offset losses, thus generating consolidated tax benefits, because of the regulatory scheme. By contrast independent producers do not necessarily know in advance if they will have sufficient profits to write their research and development losses off against their taxes.

**43.** *Cf. American Public Gas Ass'n v. FPC*, 567 F.2d 1016, 1037 (D.C.Cir.1977) (use of an economic model based on limited empirical evidence endorsed).

**44.** *See* text accompanying note 25 *supra.* Direct evidence of a causal relationship between the proffered incentive and increased spending on research and development should have been available (if the incentive had the effect the Commission claimed it would) and made part of the record in the agency proceeding.

**45.** J.A. 251–52. The ALJ found that for 1973–75, while Columbia saved approximately $60.9 million by filing consolidated returns, only about $20.7–$22.9 million of these savings went to the exploration and development companies. The remainder, approximately $38–$40.2 million went for general corporate purposes. *Id.* Through an exemption to an SEC regulation which requires holding companies such as Columbia Gas to apportion consolidated tax savings to all affiliates in proportion to the taxable income or tax payments of each, 17 C.F.R.

The Commission was obviously aware of the conflict between the evidence of record and the Commission declaration on the incentive effect of retained tax savings. Commission counsel attempted to excuse the disparity between the savings retained and tax savings devoted to e & d. The Commission urged in its brief that tax savings not directly reinvested eventually find their way to the e & d companies since the parent company finances exploration and development.[46] The Commission cites no evidence that tax savings "trickle down" from the parent e & d affiliates. FERC asks this Court to take it on faith that such funneling of tax savings does occur.[47]

For this Court to uphold the Commission, we must determine that the rate order was premised on substantial evidence. We find evidence of the incentive effect offered as justification for corporate retention of tax savings insubstantial. Moreover, there is substantial evidence that retained tax savings go for general corporate purposes.

When the Commission acts in its rate-making role, it must act with statutory authority and factual support. Having determined that the Commission had the statutory authority in this case, we reverse because the Commission's orders were not based upon substantial evidence[48].

## CONCLUSION

This case is remanded to the Commission for proceedings not inconsistent with this Opinion. It is so ordered.

WALD, Circuit Judge, concurring:

I concur in the decision to remand the rate on both grounds cited in Judge Robinson's opinion but, in view of Judge MacKinnon's dissent on the e & d incentive ground, I wish to make a few additional observations. I agree with the two FERC Commissioners who dissented from the Commission's approval of the failure to pass through the consolidated income tax savings here on the basis that

> [a]fter seven years, it would seem reasonable not merely to say, 'gas is short,' but to seek and utilize some evidence that the specific tax treatment given is having the effect desired.[1]

That evidence is not to be found in this record, and contrary to the dissent, I do not think a purely theoretical incentive, the effectiveness of which is belied by the facts in the specific case, is sufficient to justify a deviation from normal ratemaking practices. *See* Maj.Op. at n.45. Though this court in the past has approved agency use of predictive economic models in place of actual costs in ratesetting cases, we have always stressed that the agency must make

---

§ 250.45(b)(6) (1980), Columbia is able to give the e & d companies as much of the tax savings from filing a consolidated return as it desires. Given this capability, the ALJ found it inexcusable that the e & d companies did not receive more of the savings. J.A. 250–51.

**46.** Commission Brief at 32–33. Commission counsel explained:

> ... in the period of the early 1970's, the [company] spent $270 million on exploration. This money came not only from payments the profitable affiliates made to the exploration companies under the exemption to 17 C.F.R. § 250.45(b)(6), but also from "financing with the parent company". One method of providing an intragroup subsidy is the allocation of earned surplus funds in the corporate treasury. Another method is borrowing by the parent. To the extent the former is successful, the latter is unnecessary. Thus, the extra millions of dollars saved in taxes but not paid to exploration companies still find their way to those companies and also

ease the borrowing needs of Columbia Gas. *Id.*

**47.** This Court has never allowed rhetoric as a substitute for a record:

> Under the shadow of the nationwide shortage of natural gas, the inventive device has been seized upon increasingly by the FPC and paraded before the courts in a number of guises, perhaps on the assumption that the courts would not be inclined to reject them all.

*Cities of Fulton v. FPC*, 512 F.2d 947, 950–51 (D.C.Cir.1975).

**48.** While the treatment of the West Virginia losses was correct, that alone is insufficient to support a rate order of the magnitude that issued in this case.

**1.** Dissenting Opinion, Columbia Gas Transmission Company, Docket Nos. RP75–105–06, Dec. 26, 1979, at 11, J.A. 359.

"a conscientious effort to take into account what is known as to past experience and what is reasonably predictable about the future" to monitor whether the model's assumptions work in practice.[2] In this case, the agency has made no attempt at all to verify the accuracy of its prediction that granting pipeline affiliated producers tax incentives will spur increased investment in research and development of natural gas supplies, although according to its own estimate, it has either followed or advocated following the challenged method of tax allocation for seven years. In a specific case such as this, where evidence showing how the tax savings have or will affect e & d activities should be readily at hand, I can find no excuse for not requiring substantiation of FERC's predictions. Without such evidence, judicial review of agency decision-making amounts to nothing more than unquestioning judicial acceptance of unproven agency assumptions. ·

Candidly, my review of the agency's intricate rationale for upholding the failure to pass through the tax savings due to the e & d losses leads me to question whether FERC itself fully understands what policies it is following or why. In both Opinion No. 47[3] and its brief,[4] FERC refers to the "fact" that a failure to retain the consolidated tax savings in the parent company would frustrate implementation of the national gas rate established in Opinion No. 770 and approved by this court in *American Public Gas*.[5] FERC seems to be arguing that consumers of the regulated pipelines already receive the tax benefits they are clamoring for here in the form of a lower price for new natural gas, which is factored into the pipeline's overall cost, and thus to grant them the additional benefit of a pass through of tax savings in this proceeding would be to compensate them twice. But, in addition to failing to explain or substantiate this claim in the face of petitioner's denial that the e & d companies here do (or are expected to) produce gas that will be sold at this national rate,[6] FERC also fails to explain why, having decided to pass through a substantial portion of tax deductions attributable to pre-production e & d expenses to consumers through the national rate for new gas, it does not feel any comparable need to pass through the tax savings generated through use of a consolidated return by research and development companies handling gas not covered in these national rates. The Commission never discusses this seeming contradiction.

In sum, the Commission has quite confused me by presenting multiple and seemingly contradictory reasons for allowing the parent company to retain all the consolidated tax benefits despite the absence of proof that the e & d activities will benefit thereby. I cannot fathom whether this is an error of substance or presentation. However, I urge the Commission on remand to attempt a clearer articulation and reconciliation of its national rate, e & d incentive, and parity theories as they apply to the record in this proceeding.

MacKINNON, Circuit Judge, dissenting in part:

While generally concurring in the majority opinion, I dissent from the conclusion that the Commission lacked a sufficient basis for permitting the pipeline to retain the benefit of consolidated tax savings attributable to the losses of affiliated exploration and development (e & d) companies.[1]

The rule of decision applied by the Commission in this case was first stated as

---

**2.** *American Public Gas Assoc. v. FPC*, 567 F.2d 1016, 1037 (D.C.Cir.1977).

**3.** Opinion No. 47, Columbia Gas Transmission Company Opinion Determining Proper Cost of Service Treatment of Tax Liability Arising From the Filing of Consolidated Income Tax Return, July 2, 1979, at 13, J.A. 275.

**4.** Br. for Respondent at 42–45.

**5.** *See* note 2 *supra*.

**6.** Reply Br. of Petitioner at 4–5.

**1.** Section 4(e) of the Natural Gas Act, 15 U.S.C. § 717c(e), directs the Commission to determine "just and reasonable" rates for natural gas companies, including interstate pipelines. The Commission traditionally has done this by fixing a rate of return on costs recognized for ratemaking purposes. Included in those costs is an allowance for federal income taxes. *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1964). The pipelines here,

dictum in *Florida Gas Transmission Co.*, 47 F.P.C. 341 (1972):

> At the present time, we seek to avoid a determination that will tend to defeat efforts to acquire additional gas supplies or constitute a disincentive to exploration and development. Since 1968, all industry data indicate that gas is being consumed at a greater rate than it is being discovered .... Therefore, if a case were before us where an affiliated, regulated or non-regulated, producer of oil or gas showed a tax loss, and this loss company were joined in a consolidated return with a pipeline, ... [we would not] reduce the rates of a regulated pipeline because of such affiliated exploration and development activities [for such reduction] would be discouraging to the very enterprise we now want to encourage.

*Id.* at 362. Summarizing this policy into a general principle, which it applied in the case before it, the Commission said, "In our opinion a utility should be regulated on the basis of its being an independent utility; that is[,] a utility should be considered as nearly as possible on its own merits and not on those of its affiliates." *Id.* at 363. In subsequent decisions the Commission has reaffirmed the rationale of *Florida Gas*, see *Southern California Edison Co.*, No. 821, 13 Fed. Power Serv. 5–163, 5–169 (September 22, 1977), although this is the first occasion of judicial review.

In the present case the Commission announced its continuing adherence to the *Florida Gas* doctrine.

In *Florida Gas* the Commission explained that time had eroded the force of its precedents on the consolidated tax issue, that those authorities were "no longer ... persuasive," and that "to reduce the rates of a regulated pipeline because of affiliated exploration and development activities would be discouraging to the very enterprise we now want to encourage." [ ] We see nothing that has happened since *Florida Gas* to suggest that the need to stimulate the search for new domestic energy supplies is less pressing in 1979 than it was in 1972. The Department of Energy Organization Act of 1977 and the Natural Gas Policy Act of 1978 express legislative judgments that the Nation's energy needs are more acute than ever.[2] The latter statute is very much to the point here.[3] The Congress obviously attached greater weight to inducing companies to go out to look for gas than it did to the previous consumer-protection objective of narrowly-defined cost-based rates for discovering and producing gas supplies.

... To require [the pipelines] to pay [their] customers the tax savings from losses incurred in the search for new gas supplies will operate as a disincentive to continued gas supply development activities by pipelines and other regulated utilities.

J.A. 276–77.

The majority finds this reliance on the *Florida Gas* rule inadequate because the

---

by filing a consolidated income tax return with affiliated exploration and development companies, paid less total tax than they would have paid had each company stood alone. It is by using their "stand alone" tax figure (rather than their smaller, apportioned share of consolidated taxes) to compute the tax allowance that the pipelines are said to be retaining the benefit of consolidated tax savings.

The majority acknowledges that "[t]he Commission is not obligated to follow any particular formula for the apportionment of consolidated tax savings," at p. 952 *supra,* "there [being in ratemaking] no mystique requiring that expenses actually be 'paid'." *American Pub. Gas Ass'n v. FPC*, 567 F.2d 1016, 1038 (D.C.Cir.1977), *cert. denied*, 435 U.S. 907, 98

S.Ct. 1456, 55 L.Ed.2d 499 (1978). The issue here is whether the Commission has articulated an adequate basis for the "stand alone" tax treatment.

2. The Commission said in footnote:

> At the moment, the natural gas supply situation seems better than it has been for a long time. But that is no cause for complacency. By now, the folly of looking at these matters from short-run perspective should be apparent to all.

3. The Commission in footnote said, "Of course, that is not so as a matter of law. But it is so as a matter of policy."

Commission adduced insufficient evidence to show (1) that any part of the pipelines' investment in the e & d companies was actually induced by the Commission's adoption of its *Florida Gas* policy or (2) that more than a portion (about one-third) of the consolidated tax savings was directly reinvested in those companies. Maj. op. at notes 42–48 and accompanying text. In my view, the majority misunderstands the nature of the Commission's decision, and, consequently, the type of evidence needed to show that the decision was "arbitrary or capricious" and the extent to which it must be supported by "substantial evidence."

Agency action must be affirmed unless it is beyond statutory authority, procedurally defective, arbitrary or capricious, an abuse of discretion, or unsupported by substantial evidence necessary to the decision. *E. g., National Small Shipments Traffic Conf., Inc. v. CAB*, 618 F.2d 819, 826 (D.C.Cir. 1980). The majority agrees that the action taken here was within statutory authority and free of material procedural defect. This leaves only the questions whether the agency had an adequate factual basis and exercised a reasoned discretion.

The application of this standard of review is influenced to a large extent by the nature of the decision made by the agency. The "facts" supporting a prediction of where the public interest lies are not susceptible to the same degree of proof as are the facts supporting, say, a decision to revoke a license, and the standard of review—whether it is labelled arbitrary or capricious, substantial evidence, or abuse of discretion—must take that reality into account.[4]

The "facts" underlying the Commission's decision here are that depriving the pipelines of the benefits of consolidated tax savings would provide a disincentive to natural gas production, by making investment in production activities less attractive or by depriving the pipelines of investment capital derived from profits. These are the sort of judgmental or predictive facts for which courts have traditionally declined to require specific record support. For example, in

*FPC v. Transcontinental Gas Corp.*, 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961), the Supreme Court rejected a substantial evidence challenge to the Commission's denial of a request to buy interstate natural gas directly, at a high, unregulated price. The Commission had reasoned that

widespread direct sales at high prices would probably result in price increases. Respondents appear to be claiming that the Commission should have adduced testimonial and documentary evidence to the effect that this forecast would come true. However, we do not think that the Commission is so limited in its formulation of policy considerations. Rather, we think that a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency. . . . It should also be noted that there has been a considerable showing made by the petitioners and the state regulatory commissions appearing as *amici curiae* to the effect that the Commission's forecast is well founded. . . . Moreover, as a matter of common sense, it would seem difficult to deny that the channeling of vast quantities of a wasting resource into unregulated transactions at a high price will result in scarcity to other consumers and a general price increase.

*Id.* at 29–30, 81 S.Ct. at 450. The Supreme Court followed *Transcontinental Gas* in *FCC v. National Citizens Committee*, 436 U.S. 775, 813–14, 98 S.Ct. 2096, 2121–2122, 56 L.Ed.2d 697 (1978):

to the extent that factual determinations were involved in the Commission's decision to grandfather most existing [broadcaster-newspaper] combinations, they were primarily of a judgmental or predictive nature—e. g., whether a divestiture requirement would result in trading of stations with out-of-town owners; whether new owners would perform as well as existing crossowners, either in the short run or in the long run; whether losses to existing owners would result from forced sales; whether such losses

---

4. *See generally* Davis, *Facts in Lawmaking*, 80 Colum.L.Rev. 930 (1980).

would discourage future investment in quality programming; and whether new owners would have sufficient working capital to finance local programming. *In such circumstances complete factual support in the record for the Commission's judgment or prediction is not possible or required; "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency."*

*Id.* (quoting *FPC v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961) (emphasis added).[5]

Given the nature of the Commission's decision in this case, involving as it does a matter clearly within the recognized expertise of the agency, I would require only that its prediction have a rational basis and that the Commission show that its policy logically applies to the facts before it. The latter requirement, all would agree, has been satisfied in that (1) the pipelines had affiliates engaged in exploration for new energy supplies; (2) these affiliates incurred losses during the relevant period; and (3) these losses contributed to the consolidated tax savings of the pipelines. Given these facts, the *Florida Gas* rule applies to the consolidated tax savings attributable to the losses incurred by the affiliated e & d companies.

The requirement that the prediction be rationally based is also met, in my judgment. The Commission has decided it will not reduce the rates of a regulated pipeline where the group of companies with which it is affiliated pays less tax on a consolidated basis because of losses incurred by e & d affiliates. This decision simply recognizes the profit motive that influences business decisions. If a pipeline's rates are to be reduced, and its income lowered, because of its affiliation with such e & d companies, the prospect of that affiliation is made less desirable. And the less capital available for e & d companies, the less exploration and the less production there will be.

Regardless of whether we find the agency's judgment persuasive, we must affirm it if it is rationally based.[6] Where, as here, we have "deductions based on the expert knowledge of the agency" that are plausible "as a matter of common sense," *FPC v. Transcontinental Gas Corp., supra*, 365 U.S. at 28, 29, 81 S.Ct. at 449–450, in my judgment it is our duty to affirm. It is no objection to the application of the agency's judgment that the agency has not adduced facts on this particular record to defend the appropriateness of its *Florida Gas* decision. If there is reason to conclude that depriving pipelines of e & d-based consolidated tax savings will discourage exploration and development as a *general* matter, then it was not error to apply the decision here even in the absence of proof that the policy is actually necessary to avoid discouragement of production in this particular case.[7]

I find the Commission's decision particularly reasonable in light of its rationale, developed in its opinion on rehearing, that its *Florida Gas* rule of treating the utilities

---

5. *Accord, National Small Shipments Traffic Conf., Inc. v. CAB*, 618 F.2d 819, 830 (D.C.Cir. 1980) (CAB's decision to lift tariff filing requirement based on prediction that this would encourage price competition "does not seem irrational"); *Missouri-Kansas-Texas RR. Co. v. United States*, 632 F.2d 392, 407 (5th Cir. 1980) (ICC, in considering anticompetitive effects of proposed railroad merger, not required to make specific findings about tendency of merger to encourage other future mergers; "an agency is not required to make specific findings in the course of making future projections"), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981).

6. Were this court to construct a methodology for national ratemaking, we might find it more elegant and theoretically proper to in-

clude such incentives for exploration solely within the factor for rate of return. But that is not our task, and we cannot say that the Commission was arbitrary or capricious in taking account of this public need within the context of its calculation of the tax component.
*American Public Gas Ass'n v. FPC*, 567 F.2d 1016, 1036 (D.C.Cir.1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

7. In engaging in an important policy decision such as it did in *Florida Gas* it might have been preferable for the Commission to have proceeded by industry-wide rulemaking. There is no argument presented here, however, that the Commission abused its discretion in proceeding as it did.

independently was supported not only by a policy favoring production but also by the equities of the situation. With a consolidated tax return, the Commission explained, the affiliated group uses the losses of affiliates to reduce overall taxes currently. This is an alternative to filing separate returns which would permit the loss affiliates to use the loss carry-back and carry-forward provisions in the tax law. J.A. 341.

The Commission reasoned that the tax allowances of the loss affiliates belonged to the investors in those affiliates:

> Charlottesville erroneously equates [the pipelines'] use of earned shareholder equity (derived from net profits reasonably and fairly earned, in part, from jurisdictional operations) to finance E & D operations ... with consumer paid expenses which create a loss deduction. These two sources are not the same. One is derived from the shareholder, the other from the consumer. Charlottesville would have us deprive the consolidated enterprise of the tax savings from loss affiliates despite the fact that the incurrence of the losses placed no burden on [the] pipeline customers. Those customers are being charged no more than they would if a consolidated return had not been filed.

J.A. 341–42. This reasoning follows the Commission's decision in *Southern California Edison*, No. 821, 13 Fed. Power Service 5–163 (September 22, 1977), holding that where a utility's customers did not pay for the expense leading to the losses, they were not entitled to a rate reduction based on those losses. The reasoning is also consonant with the persuasive comment of Judge Leventhal in *American Public Gas Ass'n v. FPC, supra*, 567 F.2d at 1040 n.33: "But beyond that, we are not aware of any principled basis for saying that natural gas consumers should pay less for gas simply because the unlikely hypothesis materializes and, say, Mobil Oil loses money in its Montgomery Ward investment." *See also Democratic Central Committee v. Washington Metropolitan Area Transit Commission*, 485 F.2d 786, 796 (D.C.Cir.1973) (gain on sale of depreciated property belongs to either investors or consumers, depending on who

bore the risk of loss), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974).

For the foregoing reasons, it is my conclusion that the Commission, empowered to set rates that are "just and reasonable," did not act irrationally in declining to reduce the pipelines' income tax allowance to the extent that they had achieved consolidated tax savings attributable to the losses of affiliated exploration and development companies. While otherwise concurring, I respectfully dissent from the majority's decision to reverse and remand on this issue.